In the Matter of the Accounting of HOWARD S. HOWELL, as Administrator of the Estate of COSMO DI PASQUALE, Deceased.

Surrogate's Court, Schenectady County, February 25, 1954.

*Nicholas Morsillo* for administrator.

*Lloyd I. Isler* for· Allessandro Savorgnan, Deputy Consul General of Italy, on behalf of Angela M. Di Pasquale and others.

*John F. Fitzgerald* for Sylvia Santacapita, claimant.

CAMPBELL, S.   On or about November 18, 1948, the above-named decedent was committed to the Utica State Hospital as a mental patient and he died intestate there on or about November 22, 1951.

On January 10, 1949, the acting superintendent of the hospital executed a petition to the Supreme Court for the appointment of a committee of the person and estate of the incompetent, alleging that two bank accounts, one for $4,000 in the Mohawk National Bank and another for approximately $3,800 in the Schenectady Savings Bank, were assets of the incompetent's estate.

The petition also alleged that one '' Michael Santagapeta '' was a cousin of the incompetent.

On January 17, 1949, '' Michael Santacapita '', apparently the same person mentioned in the petition as being a cousin of the incompetent, executed a document admitting the service of a copy of the petition and consenting that the matter may proceed without further or other notice to him.

Subsequently and on January 24, 1949, the Supreme Court appointed Sylvia Santacapita, presumably the wife of Michael Santacapita, as committee of the person and estate of the incompetent, upon executing and filing a bond in the sum of $8,000. This was done and Mrs. Santacapita qualified as committee.

The order appointing Mrs. Santacapita committee set forth that the committee '' shall during the month of January in each year make and file with the clerk of this court and with the director or officer having special jurisdiction over the institution where said incompetent person is confined, a just and true inventory verified as required by law of the estate of the said

incompetent, showing the estate, real and personal, and the income and profits received or derived therefrom, also the debts and credits of the said incompetent person *as far as the same shall have come to the knowledge of the committee."* (Emphasis supplied.)

On September 9, 1949, Mrs. Santacapita, the committee appointed on January 24, 1949, petitioned the Supreme Court for permission to account and to resign as such committee, and to release the bonding company of its obligation on the $8,000 bond filed when Mrs. Santacapita was appointed. On November 22, 1949, the Supreme Court made an order permitting her to resign and approved her account as presented.

The court appointed James E. O'Loughlin, Esq., an attorney and counselor at law, of Schenectady, as successor or substituted committee on November 22, 1949, and ordered a $6,000 bond to be filed. Mr. O'Loughlin complied with the order of the court and after the death of the incompetent, rendered his final account as committee and was discharged.

In the court order permitting the resignation of Mrs. Santacapita as committee, the court ordered her personal claim against the incompetent's estate fixed at $117.81 and directed payment.

In her account to the court, Mrs. Santacapita stated that the account contained " a statement of all claims presented to me or by me against the said estate which remain unpaid " and that the " committee has claims against the estate of incompetent as follows: Four weeks board and room furnished incompetent previous to his commitment, by this committee, @ $15 per week, $60.00; cost of telephone calls made by committee to Utica State Hospital required by her duties, $12.81; expenses of committee for three trips to Utica State Hospital from Schenectady, railroad fare, taxis, meals required by her duties. $45.00."

Mrs. Santacapita's account to the court was verified October 28, 1949, in which she swore " that the foregoing account of proceedings *is in all respects just and true* " and " that she does not know of any error in said account or *anything omitted* therefrom which in any way prejudices the right of any party interested in the estate of the said incompetent." (Emphasis supplied.)

Notwithstanding this account under oath to the Supreme Court, Mrs. Santacapita, on February 28, 1952, verified this claim against this estate: " For washing, cleaning, cooking and taking meals to Cosmo Di Pasquale at his home 21 Jefferson Street, and nursing and boarding said Cosmo Di Pasquale at my

home 9 Gifford Road, from August 13, 1946, to November 15, 1948, 118 weeks at $17.00 per week, $2006.00.''

The claim was filed in this court on March 5, 1952.

Decedent was committed to the Utica State Hospital on November 18, 1948, and the entire claim covers a period of time prior to his commitment and prior to the time Mrs. Santacapita was appointed committee of the incompetent. The question naturally arises why was this claim not included in Mrs. Santacapita's account to the Supreme Court in her stewardship as committee of the incompetent.

Subsequent to the death of this intestate, attorney O'Loughlin filed his final account on March 12, 1952, and he was discharged by the Supreme Court on April 14, 1952. His account shows that on February 20, 1951, $92.64 was paid to Sylvia Santacapita '' for personal disbursements, trip to Utica State Hospital to visit Cosmo Di Pasquale '' and that on November 14, 1951, $50.45 was also paid to her with the notation '' Disbursements etc. as above.'' However, no mention in the account is made of her claim for $2,006.

It must be borne in mind that claimant's claim accrued prior to her appointment as committee. She was then, according to the dates specified in the claim, both claimant and committee of the incompetent and if she had a claim against the incompetent or his estate, she was in the best possible position to know that fact. Moreover, while Mr. O'Loughlin served as committee of the incompetent, claimant even then did not interpose her claim for services. It was not until a considerable time had elapsed after the death of this intestate that Mrs. Santacapita filed her claim for $2,006. As has been previously demonstrated herein, she swore that she had presented all claims against the incompetent when she applied to be discharged as committee and rendered her final account to the Supreme Court.

Our courts have passed upon this question in several cases which hold that when a committee accounts, all claims ought to be stated up to the time of the accounting and that where a claimant is also the accounting committee, she cannot thereafter assert her own claim against the estate of a decedent, who was the former incompetent. Such a procedure would subject an estate to expensive, wasteful and protracted litigation when the fault and neglect rested with the accounting committee.

A committee of a judicially declared incompetent person, who is also a claimant for services rendered before said commitment, must present his claim in his accounting proceeding as committee before the Supreme Court. The committee should

not wait until the decease of the incompetent person and then urge payment of the claim from the general assets of the estate in a proceeding in Surrogate's Court. The fact that the committee and the claimant are one and the same person places a high moral duty upon him to present his claim in his accounting as such committee. Such a claim should not be allowed against the estate after the demise of the incompetent.

Under our law, the acts, payments and claims of the committee, especially where the committee is also a claimant, as in this case, are conclusive, final and binding on all parties who have appeared in the accounting proceeding. (*Matter of Cowen,* 130 App. Div. 365, 366; *Matter of Buck,* 203 Misc. 1046.)

In the *Cowen* case (*supra*), Mr. Justice INGRAHAM, in an opinion, stated: " There were no facts presented upon this application to show that this accounting was not a full and true statement of the accounts, or that the interests of the incompetent were not fully protected by the referee appointed by the court and by the judge who confirmed his report."

At page 367 of the opinion, the court continues: " Undoubtedly, upon an examination of the committee's accounts only those who had had notice of the proceedings and an opportunity to file objections or question the accuracy of the account or the legality of the proceedings of the committee would be bound. But when the next of kin and heir at law of the incompetent had notice of the applications and was present at the taking of the account and made no objection to the proceedings, and no fact is alleged to show that the account was not *a full and true statement* of the proceedings of the committee and of the money and property of the estate of which he was trustee, there can be no reason why the estate should be put to the expense of a new accounting. The incompetent was a ward of the court." (Emphasis supplied.)

Concluding the opinion, the court stated: " The right to compel a committee to submit his accounts for judicial determination was essential to the proper exercise of that power, and in the absence of any allegations of fraud or mistake or improper action of the committee during the period embraced in the account, and where notice had been given to all interested in the estate who made no objection to proceedings, I think the order of the court settling the accounts was conclusive." (*Matter of Lochmuller,* 67 N. Y. S. 2d 598, 600, affd. 273 App. Div. 759; *Frankenberger* v. *Schneller,* 258 N. Y. 270, 273; *Culross* v. *Gibbons,* 130 N. Y. 447, 453, 454; *Matter of Finch,* 81 N. Y. S. 2d. 658, 660; *Matter of Basten,* 204 Misc. 937.)

Former Supreme Court Justice HEFFERNAN, of the Appellate Division, Third Department, in *Matter of Johnston* (277 App. Div. 118, 121), stated the rule as follows: " The intermediate and final accounts which the committee rendered to the Supreme Court and which have been judicially settled by that tribunal are *final, conclusive and binding on the Surrogate.* He has no jurisdiction or authority, either directly or through the intervention of a referee, to examine or inquire into those accounts. To sanction the appointment of a referee and a certified public accountant in this case would subject this estate to unwarranted and useless expense. If there are any errors, mistakes or omissions in the *accounts of the committee* or any fraud or wrongdoing in connection therewith or any liability of the committee to the incompetent's estate, the administrator has ample authority to apply *to the Supreme Court to open up the decrees* in order that the court may make whatever determination justice and equity may require. The door of the Supreme Court is always open for that purpose." (Emphasis supplied.)

Surrogate STERLEY, in *Matter of Basten* (*supra,* p. 940), sets forth the following principle: " The present case is indicative of a deficiency in the claim's support by the undisputed fact that the claimant never presented any claim to the decedent in his lifetime and that she filed none with the executors until approximately fifteen months after the issuance of letters testamentary. Such laches were dealt with in *Matter of Long* (144 Misc. 181). It seems difficult to escape the inference that the claim was an ' *afterthought* ' in such cases." (Emphasis supplied.)

Claimant's claim, verified February 28, 1952, and filed in this court March 5, 1952, seeks compensation for nursing and boarding of decedent for 118 weeks at $17 a week. This is for a period of more than two years prior to the time decedent was committed to the hospital as an incompetent.

The court calls attention to section 31 of the Personal Property Law which reads, in part, as follows: " *Agreements required to be in writing.* Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking; 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime; * * * 7. Is a contract to bequeath property or make a testamentary provision of any kind; ".

In *Matter of Quigley* (179 Misc. 210, 212) the court said: '' The claim for services rendered by the claimant in the instant case, however meritorious, is barred by the statute. (Personal Property Law, art. 3, § 31, subds. 1, 7.) In *Matter of Ditson* (177 Misc. Rep. 648), the Surrogate's Court of New York County (FOLEY, S.) in a well-considered opinion reviewed the rule laid down by the courts prior to the amendment referred to and the effect thereof. (See, also, *Bayreuther* v. *Reinisch*, 264 App. Div. 138.) We are here dealing with general principles and the construction of a statute enacted to prevent the assertion of oral claims against funds of deceased persons after their death, when a person alleged to have made the oral agreement is no longer able to make a denial. The purpose of the statute is clear. The intention of the Legislature and not the intention of the parties is controlling. The statute should not be defeated by judicial construction.''

One of the leading cases, involving the construction of this section, was written by the late Surrogate FOLEY in *Matter of Ditson* (*supra*, p. 652). In that opinion, he says: '' Acts performed out of natural love and affection or out of courtesy or solicitous care of one friend for another do not constitute a consideration. (*Gilman* v. *Hunnewell*, 191 App. Div. 908.) They are presumed to have been rendered gratuitously. As was stated by Judge, now Chief Judge, LEHMAN: ' The inference of an implied contract to pay the reasonable value of services rendered which may arise from the mere rendition and acceptance of the service cannot be drawn where because of the relationship of the parties, it is natural that such service should be rendered without expectation of pay.' (*Robinson* v. *Munn*, 238 N. Y. 40, 43.) In some cases extraordinary services have been asserted as a basis for compensation beyond that regularly paid by the decedent. Such services may have been accompanied by a hope based upon a mere expression of an intention and not the assumption of a binding obligation to remember a person in the will of the decedent. Where no legacy has been provided in a valid will, recovery against the estate ' cannot be based on disappointed expectations or even on expression of intention, in the form of a promise which was not carried out.' (LEHMAN, J., *Frankenberger* v. *Schneller, supra*, 273.) The performance of the services claimed to have been rendered here is a futility as the basis of any legal right.''

The facts, circumstances and conditions under which the services of claimant are alleged to have been rendered this decedent before his commitment to the Utica State Hospital:

claimant's failure to assert her claim as committee when she accounted to the Supreme Court in that capacity, and the payments made to her in her own accounting as committee and also in the account rendered by Mr. O'Loughlin, as substituted committee, constrain the court to hold that this claim does not possess sufficient merit to receive approval. Accordingly, the claim must be disallowed.

The court now proceeds to a consideration of the funeral bill. The gross estate reported by the administrator in his account of proceedings amounts to $4,335.93 and the bill of the funeral director amounts to $1,232.60. This is approximately 28% of the gross estate.

Counsel for the funeral director urges that funerals for decedent's nationals are more expensive than other burials. Former Surrogate WINGATE explains the attitude the court should take of this phase of the present case in *Matter of Cava* (174 Misc. 750, 753), in which he states: "In conclusion, and in reply to the urging of the claimant that greater liberality should be exercised in the quantum of funeral allowances by reason of the asserted fact that the elaborateness of the obsequies were in accordance with the national custom of the parties, the court can but reiterate its statement on a former application in this case: ' The customs of various groups of individuals respecting the nature of funeral ceremonies are always academically interesting. They cannot, however, override the express provisions of law as contained in section 216 of the Surrogate's Court Act, that no expenditure in excess of an amount which is reasonable in view of all the pertinent circumstances of a given situation is permissible.' If relatives of a decedent, for the purpose of ' saving face ' with their national or racial associates, wish to spend their own money for this purpose, such act is a privilege with which the court could not and would not interfere. It has and will, however, steadfastly decline to validate such disbursements beyond a minimum sum when they trench upon the future sustenance of widows and orphans."

Surrogate GLASSBROOK in *Matter of De Filippis* (113 N. Y. S. 2d 724, 726) states the rule as follows: "The funeral expenses that may properly be charged to an estate are a reasonable sum to be gauged by the decedent's station in life and the size of the estate he left. An excellent discussion of the subject of funeral expenses is contained in the opinion of Surrogate BROWN in Collins' Estate, 157 Misc. 739, 285 N. Y. S. 710. See also: In re Smallman, 138 Misc. 889, 247 N. Y. S. 593. Though there is no set percentage formula for determining the reasonable-

ness of funeral charges yet the propriety of funeral expense payments is to be considered in each case. Re Cava's Estate, 174 Misc. 750, 21 N. Y. S. 2d 999; Re Greco's Estate, 190 Misc. 769, 78 N. Y. S. 2d 429. In the Cava case cited above it was held that national custom was no justification for payment or liability for exorbitant and excessive funeral expense.''

In view of the foregoing the court is of the opinion that the funeral bill in this case should be reduced $250, making the total $982.60. This amount will be allowed in view of the circumstances surrounding the death of this intestate in the Utica State Hospital, and the lack of knowledge regarding his heirs at law and next of kin at the time of his demise.

The report of the referee, heretofore appointed in this matter, is hereby modified in accordance with this opinion.

Enter decree accordingly.